# STATE OF MICHIGAN

# COURT OF APPEALS

ALTICOR INVESTMENTS, INC.,

Plaintiff-Appellee,

UNPUBLISHED
October 27, 2015

v

DEPARTMENT OF TREASURY,

Defendant-Appellant.

No. 322000
Court of Claims
LC No. 12-000138-MT

Before: M. J. KELLY, P.J., and MURRAY and SHAPIRO, JJ.

PER CURIAM.

Defendant Department of Treasury (the Department) appeals as of right an order of the Court of Claims granting summary disposition to plaintiff Alticor Investments, Incorporated (Alticor) under to MCR 2.116(C)(10). The Court of Claims determined that based on the plain language of the license agreements between Alticor and Quixtar Investments, Incorporated and Quixtar Canada Corporation, the payments Alticor received pursuant to the agreements were not for software royalties, and were, therefore, not subject to taxation under the Michigan Single Business Tax Act (SBTA).[1] The court, therefore, granted summary disposition in Alticor's favor and ordered the Department to refund plaintiff $1,312,815.25 plus statutory interest. We affirm.

At issue in this case is the Single Business Tax (SBT) paid by Alticor between September of 1999 and August of 2004. During that period, Alticor developed intellectual property for use in its sales processes. According to Alticor, the intellectual property included trademarks, confidential business information, domain names, patents, copyrighted materials, trade dress, know-how, and trade secrets. The intellectual property was licensed by Alticor's predecessor in interest to Quixtar Canada in 1999, and in 2006, Alticor licensed the property to Quixtar Investments. The patents and patent applications covered under the agreements were listed on Schedule B of the license agreements. Pursuant to the license agreements, Alticor received royalty payments. Alticor did not, however, include those royalty payments in its calculation of taxes owed under the SBT.

---

[1] Formerly MCL 208.1 *et seq.*, repealed by 2006 PA 325. All references in this opinion are to the former version of the SBTA.

Before its repeal, the SBT was a type of value added tax "upon the privilege of conducting business in Michigan." *TMW Enterprises, Inc v Dep't of Treasury*, 285 Mich App 167, 173; 775 NW2d 342 (2009). The starting point for calculating a business's SBT was to determine the business's tax base. *Id*. The tax base consisted of the business's federal taxable income plus numerous modifications. *Id*. at 173-175. Pursuant to MCL 208.9(7)(c)(*vii*), a business could deduct from its tax base all royalties included in its federal taxable income, except for royalties received for "application software or operating software pursuant to a license agreement." The statute defines "application computer software" as "a set of statements or instructions that when incorporated in a machine usable medium is capable of causing a machine or device having information processing capabilities to indicate, perform, or achieve a particular business function, task, or result for the nontechnical end user." MCL 208.9(4)(g)(*viii*)(A). Accordingly, in this case, if the royalty income generated under the license agreements was for software, then Alticor would have to include the royalty income in its tax base when calculating the SBT for the periods in issue.

The Department audited Alticor for the periods in issue. During the course of the audit, the Department's auditor asked about the breakdown of royalties from the license agreements. Thomas Zandstra, an Alticor employee, responded that the "royalty income is for software, trademarks, and other property." Relying on Zandstra's statement, defendant disallowed deductions for royalty income received from the licensing agreements, alleging that the royalties contained payments for application software under MCL 208.9(7)(c)(*vii*). Consequently, the Department assessed Alticor for $1,303,891.31 in taxes due and interest. Alticor paid the amount under protest and filed a refund claim.

At the close of discovery, Alticor filed a motion for summary disposition under MCR 2.116(C)(10). In support of its motion, Alticor submitted affidavits from expert witnesses in order to demonstrate that the licensing agreements did not include software. The Court of Claims granted Alticor's motion, finding that the plain language of the licensing agreements

> reveals that Alticor and the licensees intended that royalty payments would be made for the use of trademarks, patents, confidential business information, domain names, trade dress, trade names, copyrighted materials, know-how, and trade secrets. The agreements lack any reference to licenses of software, and there is no language in either agreement that provides any basis to treat the royalties at issue as derived from the licensing of software.

Having found the agreements to be unambiguous, the court characterized Zandstra's statement as extrinsic evidence and did not consider it. The Department moved for reconsideration, arguing that the contract was ambiguous. The court, however, denied the motion, finding that the Department had failed to raise the issue of ambiguity in response to Alticor's summary disposition motion and had failed to identify any ambiguous contractual language.

We review de novo a trial court's grant of summary disposition. *In re Smith Trust*, 480 Mich 19, 23; 745 NW2d 754 (2008). Questions of law are also reviewed de novo. *Id*. at 24. Further, when interpreting a contract, a court must "determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning." *Id*. "If the contractual language is unambiguous, courts must interpret and enforce the contract as written,

because an unambiguous contract reflects the parties' intent as a matter of law." *Id.* "However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties." *Id.*

Here, the Department argues that there is a latent ambiguity in the contract because undefined terms in the contract—such as "copyrighted materials," "trade secrets," "confidential business information," and "ancillary intellectual property"—may encompass computer software.

> A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggest a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings. *To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation.* Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue. [*Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010) (internal quotation marks and citations omitted) (emphasis added).]

Here, the extrinsic evidence presented by the Department consists solely of Zandstra's statement that some of the royalties received under the agreement were for software and an alleged statement from Theresa Dykhuis, the director of North America tax for Alticor's parent company, that it was software. The Department offered no expert testimony or other analysis.

Alticor, however, presented expert affidavits in support of its contention that the contract did not include software. First, Scott Timmerman, a patent attorney, analyzed the licensed patents and patent applications and concluded that "[t]he business systems and processes that are the subject of these patents can be, and often are, implemented with software programs; however, no specific software code is included in Schedule B patent claims." Next, Steven Kursh, Ph.D, CSDP, CLP, an expert in software licensing, analyzed the language of the licensing agreements in light of the customs and practices of the licensing industry. He found that the agreements lacked typically-found clauses and provisions that would protect any computer code, prohibit reverse engineering, address upgrades and support, explain warranties, and detail the responsibilities of the parties should the software not perform. Kursh concluded that the licensing agreements were for intellectual property, not software, and that the Department's assumptions regarding the agreements "are in direct contrast to the language in the agreement[s] as viewed from the lens of software industry licensing practice." Finally, Dykhuis stated that neither she nor Zandstra had reviewed the license agreements at the time Zandstra replied to the auditor's question. Dykhuis stated that she later reviewed the license agreements, and based on her review, she concluded that Zandstra's statement to the auditor was incorrect. She stated that she informed the Department of Zandstra's error.

We have reviewed the available extrinsic evidence. Based on our review, we conclude that the extrinsic evidence does not support "an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation." *Shay*,

487 Mich at 668. Thus, there is no latent ambiguity in the contract and the trial court did not err in concluding that the contract was unambiguous. As the trial court noted, the license agreements lack any reference to licenses of software and there is no language in either agreement that provides any basis to treat the royalties at issue as derived from the licensing of software. The terms contain no latent ambiguity when read in context of and harmonized with the entire licensing agreement. See *Royce v Citizens Ins Co*, 219 Mich App 537, 542; NW2d 144 (1996) (stating a contract is ambiguous when "after reading the entire document, its language can be reasonably understood in different ways").

Affirmed.


/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Douglas B. Shapiro